ALLEN B. HARRADINE, Individually and as Director of the Orleans County Taxpayers Association, Inc., and All Others Similarly Situated, Respondent, v BOARD OF SUPERVISORS OF ORLEANS COUNTY, Appellant. STATE OF NEW YORK, Respondent.

Fourth Department, June 1, 1979

### APPEARANCES OF COUNSEL

*Thomas J. Young* and *Nixon, Hargrave, Devans & Doyle (David Lascell* of counsel), for appellant.

*Vincent S. White (Robert Lane* of counsel), for respondent.

*Robert Abrams, Attorney-General (Robert Imrie* of counsel), for State of New York, respondent.

### OPINION OF THE COURT

SCHNEPP, J.

We are called upon to examine the role of the courts in the formulation and adoption of a constitutional plan for the reapportionment of the Board of Supervisors of Orleans County (Board). Special Term permanently enjoined the Board from holding a public hearing on a reapportionment plan previously rejected by the voters and *sua sponte* imposed its own judicial plan. We disapprove of the usurpation by the court of a legislative function and its intervention in a legally authorized legislative proceeding. A brief description of the factual background of the court's action will be useful.

This action, which was commenced in 1971 by plaintiff Stanley R. Kubatek, sought a judgment declaring the existing scheme of electorate representation in Orleans County unconstitutional and directing the Board to reapportion itself so as to comply with the New York State and the United States Constitutions. The action resulted from "the one person, one vote" rule enunciated by the United States Supreme Court in *Baker v Carr* (369 US 186) and *Avery v Midland County* (390 US 474). On October 4, 1971 Special Term granted plaintiff's motion for summary judgment and (1) ordered the Board to devise a constitutional plan for reapportionment which would comply with the Municipal Home Rule Law of the State of New York, (2) imposed an interim plan of weighted voting, and (3) retained jurisdiction of the action until a permanent plan of reapportionment of the Board was approved. In No-

vember, 1972 the court found unconstitutional a reapportionment plan formulated by the Board called "Local Law No. 3-1972" and directed that a revised plan be submitted on or before December 1, 1972. Thereafter, the assigned Special Term Justice retired and plaintiff Kubatek was elected to the Board. For the years that followed, there is no indication that any action was taken by any party to remedy the existing apportionment problems until April 4, 1977 when the present plaintiff forwarded to the Board proposed stipulations for the substitution of an attorney and a new party plaintiff. Upon stipulation Special Term ordered the substitutions and allowed the Board three months to present a final plan of reapportionment. In addition, interim progress reports were ordered on a monthly basis. A flurry of activity followed. An interim report was submitted to the court and a timetable for the adoption of a new plan proposed. A court order on July 22, 1977 incorporated a stipulation of the parties which agreed to the holding of public hearings during the week of August 8, 1977 and to the submission of a final report by the Board on August 19, 1977. Public meetings were held. On August 26, 1977 after the taking of testimony, two alternative plans designated as "Local Law Intro. No. 5" and "Local Law Intro. No. 6" for the reapportionment of Orleans County were held constitutional by the court. The first plan, No. 5-1977, was a weighted voting scheme; and the second, No. 6-1977, a redistricting scheme. The court order directed that both local laws be submitted to the voters at the November, 1977 general election. Both plans were defeated at the polls. By order dated December 14, 1977 the Board was directed to present to the court not later than April 17, 1978 a constitutional reapportionment plan for Orleans County along with a proposal for its adoption and implementation. The interim plan of weighted voting imposed by the court in 1971 was continued. On May 16, 1978 the court declared constitutional a board-formulated plan, Local Law No. 3-1978, and directed its submission to the voters of the county at a special election on July 18, 1978. It was also defeated. On July 20, 1978 a revised Local Law No. 3-1978, identical to Local Law No. 5-1977 previously defeated by the voters in November, 1977, was introduced at a board meeting. A public hearing on the proposal was scheduled for August 17, 1978. By letter dated August 4, 1978 the County Attorney advised the court of the special election's result and the July 20 action taken by the Board. By letter dated August 11, 1978 the County Attorney

further advised the court that he had formally informed the Board that the court was not in favor of the new proposal and that it desired to see a "legislative plan" on the November, 1978 ballot. Further, the letter detailed the Municipal Home Rule Law time limitations and indicated that there was insufficient time to permit the placing of a proper "legislative plan" for the county on the November ballot. Furthermore, it stated that the Board planned to hold the public hearing, "waive the rules", and allow a general discussion on the entire reapportionment matter. On August 11, 1978 the Board adopted a resolution to "proceed with the public hearing" on August 17, 1978 and urged the public "to attend and express their views on said Local Law No. 3 and any other proposal for reapportionment of the Board of Supervisors". The resolution also provided that the County Attorney meet with the court and the Board "as soon as possible" after the public hearing. By order granted on August 15, 1978, returnable on August 17, 1978, the Board was directed to show cause why the court should not (1) adopt a court redistricting plan on a legislative representative basis, or, in the alternative, a reapportionment or redistricting plan described in the moving papers, or other described alternative plans, and (2) place the plan on the ballot at the 1979 general election. The Board was restrained and ordered not to hold the public hearing scheduled for August 17, 1978 pending a hearing on the show cause order. On August 17, 1978 the court heard the arguments of counsel and the unsworn comments of individuals including members of the Board. The court suggested as an imposed judicial plan a five-member legislature with specific districts observing town lines. It then granted time to counsel to file briefs, preliminarily enjoined the Board from holding the public hearing and adjourned sine die. Following the issuance of a memorandum decision dated September 28, 1978, the court without a further hearing signed an order on October 13, 1978 and an amended order and judgment on November 1, 1978 which "preliminarily and permanently enjoined [the Board] from holding said public hearing". A totally new apportionment plan was imposed upon Orleans County providing for the election of a seven-member board—three to be elected at large and four from legislative districts, each of which included specified towns in Orleans County. The Board of Elections was ordered to "take the necessary steps for the election in November 1979 of one 'County Legislator' to represent each of the four districts * * * and the election of three

'County Legislators at Large' to represent the County electorate as a whole".

Appellant claims that the court exceeded its authority in enjoining the Board from acting within explicit statutory authority, that the order was based on insufficient proof, and that the court failed to act in accordance with the CPLR and unreasonably imposed a judicial apportionment plan.

Section 10 (subd 1, par [ii], cl [a], subcl [13]) of the Municipal Home Rule Law enacted in 1969 authorizes a county to adopt and amend local laws pertaining to the apportionment of its legislative body. Under subdivision 5 of section 20 of the Municipal Home Rule Law, the legislative body is prohibited from passing a local law until it has held a public hearing thereon. The local law adopted becomes effective 45 days after its adoption (Municipal Home Rule Law, § 24, subd 1, par a). In Orleans County a local law is not subject to a mandatory referendum (Municipal Home Rule Law, § 10, subd 1, par [ii], subpar a, cl [13], subcl [e]). However, upon a petition signed within the 45 days by 5% of the qualified voters, the local law shall be submitted at a referendum or the Board itself may adopt a resolution requiring that a proposition for its approval be submitted at a referendum at the next general election or at a special election (Municipal Home Rule Law, § 24, subd 2, par j, cls [1], [2]).

The applicable provisions of the Municipal Home Rule Law were enacted in 1969 to provide flexibility to local governments seeking to restructure their legislative bodies, and specifically, to lessen previous referenda requirements in order to give local governments maximum reapportionment freedom (see Municipal Home Rule Law, § 10, subd 1, par [ii], cl a, subcl [13]; see statement of legislative intent, L 1969, ch 834, § 1). Clearly, the Legislature designed the Municipal Home Rule Law to afford the public an opportunity to be heard and a forum to discuss proposals. The Board of Supervisors, in planning a public hearing on Local Law No. 3, was simply attempting to employ the authority it had pursuant to law.

Reapportionment is primarily a matter for the consideration and determination of the legislative body (*Burns v Richardson,* 384 US 73; *Matter of Schneider v Rockefeller,* 31 NY2d 420). This is not to say, however, that the court is devoid of power if the Legislature fails to comply with the mandate of the equal-population principle. Where a malapportionment threatens constitutional rights, a court is empowered to take appropri-

ate action in order to insure that no further elections are conducted under an invalid plan (see *Lucas v Colorado Gen. Assembly,* 377 US 713, 736; *Reynolds v Sims,* 377 US 533, 585). This is precisely what the court did here in 1971 when it found the legislative apportionment scheme unconstitutional and took appropriate action.

The central question presented in this case is when should further court intervention be permitted. It cannot be gainsaid that the court has the power to retain jurisdiction until a constitutional plan of reapportionment is approved. Here the court acted properly in 1972 in declaring a plan unconstitutional and in 1977 and 1978 in declaring plans constitutional and ordering them to a vote of the electorate.

In *Reynolds v Sims* (377 US 533, 586, *supra)* the United States Supreme Court stated that "legislative reapportionment is primarily a matter for legislative consideration and determination, and [that] judicial relief becomes appropriate only when a legislature fails to reapportion *according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so"* (emphasis supplied).

The New York cases on this point roughly follow the Federal mandate. In *Matter of Orans* (15 NY2d 339, 352) the Court of Appeals cited *Reynolds (supra)* saying that legislative reapportionment is primarily a matter for legislative consideration and determination and that courts should only intervene out of necessity when a State apportionment scheme has been held Federally unconstitutional and the Legislature has failed to pass a valid reapportionment. In *Matter of Orans* (17 NY2d 107), a related case, the Court of Appeals set out the rule that a New York court can declare a reapportionment scheme invalid and impose an interim plan and retain jurisdiction where an existing plan is violative of the constitutional requirement of an equal vote. Other New York cases have also stressed this preoccupation with ensuring the constitutionality of a reapportionment scheme as the primary judicial function (see *Iannucci v Board of Supervisors,* 20 NY2d 244, 254).

In *Saxton v Carey* (44 NY2d 545, 549) the Court of Appeals stated in affirming the denial of a motion for injunctive relief and holding certain appropriation bills to be constitutional that: "Our State Government, like the Federal Government, is a tripartite institution, with power variously distributed between three coequal branches [citations omitted]. It comprises

a system of checks and balances intended to ensure 'the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men. It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others' ". In *Matter of Schneider v Rockefeller* (31 NY2d 420, 427, *supra)* the Court of Appeals in concluding that a good-faith effort had been made to comply with the equal-population principle stated that "it is not our function to determine whether a plan can be worked out that is superior to [the challenged plan]. Our duty is, rather, to determine whether the legislative plan substantially complies with the Federal and State Constitutions."*

Here, the thrust of the application for the issuance of the temporary restraining order on August 17, 1978 was against the Board's consideration of a reapportionment plan which had been declared constitutional by the court but rejected by the voters. The court pointed out in its memorandum that the public hearing, if held, would have led to the adoption of a weighted voting plan which had been rejected twice by the voters and therefore result in the situation where the Board could "very well impose its plan through the back door after having been unable to do so through the front". Since 1971 the court has imposed an interim plan of weighted voting on the county. Although the court in its memorandum decision in August, 1978 characterized it as "constitutionally impermissible" due to the percentage variations between townships as demonstrated by the Board's own expert witness, the court has not declared it unconstitutional and, indeed, the record does not establish that the appellant was permitted to be heard on this issue. In the event that the court imposed interim plan is held unconstitutional, then upon appropriate application and an opportunity to be heard, judicial intervention by way of the imposition of a constitutional *interim* plan is not unwarranted (see *Matter of Orans,* 15 NY2d 339, *supra).*

Here, however, the Legislature by its precise action in

---

* See *Prentiss v Cahill* (73 Misc 2d 245, 251 [MAHONEY, J.]) where the court stated: "[I]t is not the duty of the court to police the political effect of legislatively proposed plans of reapportionment. If such plans meet the requisite constitutional standards, in that they are not patently invidious in proposing a political scheme of gerrymandering, they are entitled to approval. It is the People themselves, either by changing their political representation at the ballot box or by striking down a plan in a referendum, that should determine political issues, not the courts."

calling the hearing was seeking to reapportion according to Federal constitutional requisites. Reapportionment proposals had been defeated at the general election in 1977 and a special election in July, 1978. The Board immediately took steps in a timely fashion to put into effect a plan which the court had already approved. Built-in safeguards in the law insure protection against precipitous and unwarranted legislative action. The Board was merely attempting to fulfill its duty of formulating a constitutionally sound plan for reapportionment.

Since the proceeding was reactivated in 1977, the court has maintained close supervision. There is no indication in this record of legislative inaction or impotence after the original delay, which has been condoned or at least not attacked in this proceeding. Special Term even commended the Board for its work by recognizing that "this Legislature has worked hard, diligently under my direction (etc)", but noted that the electorate failed to co-operate with the Board. It is apparent that failure to adopt a one-man one-vote rule is not due to a lack of diligence by the Board but to voter apathy. The Board submitted interim reports to the court. The Board retained a technical expert on municipal reapportionment who utilized computer analysis to explain various proposals at public hearings and rendered expert testimony with respect to the constitutionality of any plan ultimately submitted for the court's consideration. Public meetings were held. Furthermore, the court has declared three different plans constitutional. The Board presented plans to the voters in both a general and special election. The genuine good faith of the Board to establish a constitutional apportionment plan for the county and to abide by the judicial decree is evident. There is no indication in the record that the Board either individually or as a unit deliberately encouraged defeat of propositions for the approval of these local laws. The fact that it may have acted sooner does not deprive the Board of its power to formulate an acceptable constitutional plan. There is no doubt that part of the delay is the product of the democratic process. The Board acted with diligence in calling the very hearing that was restrained. The facts simply do not warrant a holding that the Board forfeited its responsibility to speak for the electorate in producing a plan for reapportionment (see *Prentiss v Cahill,* 73 Misc 2d 245, *supra).*

Judicial intervention was inappropriate to restrain the legis-

lative reapportionment hearing. There was no evidence of a breach of duty or a violation of the law by the Board which might create a need for judicial intervention (see, generally, *New York Public Interest Research Group v Carey,* 42 NY2d 527). The legislative scheme encourages the course of action which the Board attempted to pursue. The lower court has previously declared Local Law No. 3 constitutional. Thus, both the substantive and the procedural aspects of the law are authorized under the Municipal Home Rule Law and the results of the proper workings of the Municipal Home Rule Law are of legislative and not of judicial concern. It is one thing to pass upon the constitutionality of the composition of a legislative body or a reapportionment plan; it is a disparate act to prevent a legislative body from carrying out its duties and imposing the judicial restraint of a plan of apportionment.

It is noted that the imposition of the judicial plan upon the county was not consistent with the relief sought in the application which requested an order placing plaintiff's plan or a judicial plan or an alternative one on the November ballot. Instead of granting this relief, the court imposed a plan which was not subject to public referendum.

In view of the foregoing, the judgments of the court should be reversed and the applications dismissed. Accordingly, it is unnecessary to pass on the question of the alleged failure of the court to comply with CPLR article 63.

SIMONS, J. P., CALLAHAN and DOERR, JJ., concur.

Judgments unanimously reversed, on the law and facts, without costs, and applications dismissed.